UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Liza Pizarro, as Administrator of the Estate of Daruis M. Pizarro,<br><br>                Plaintiff,<br><br>      -against-<br><br>WESTCHESTER COUNTY; WELLPATH LLC; NEW YORK CORRECT CARE SOLUTIONS MEDICAL SERVICES, P.C.; DR. JEROME NORTON; and HELENE BISHOP, R.N.,<br><br>                Defendants. | Case No. _____<br><br><br>**COMPLAINT<br>AND JURY DEMAND** |

## PRELIMINARY STATEMENT

1.      This is a civil rights action brought by Plaintiff Liza Pizarro as Administrator of the Estate of her son Daruis M. Pizarro.  Mr. Pizarro died by suicide on October 19, 2022, because Defendants failed to provide him with basic mental health care services while he was detained in the Westchester County Jail ("WCJ").  Mr. Pizarro was just 22 years old.

2.      Mr. Pizarro was arrested on federal robbery charges on August 12, 2022, and housed at the WCJ as a federal pretrial detainee beginning on August 14, 2022.  At admission, Mr. Pizarro informed WCJ staff that he was depressed, had been psychiatrically hospitalized only a month prior, and that he had made at least one previous suicide attempt. WCJ's intake nurse observed that Mr. Pizarro appeared "overly anxious, afraid, or angry" and that this was his first incarceration.  As a result, WCJ classified Mr. Pizarro as having a "crisis-level mental disorder" and placed him on suicide watch.  Mr. Pizarro remained on suicide watch until August 16, 2022.

3.      After being released from suicide watch, a psychiatric provider evaluated

1

Mr. Pizarro but failed to document his history of psychiatric hospitalization and suicide attempts and failed to order either treatment or medication. Predictably, Mr. Pizarro's mental health further deteriorated. By September 2, 2022, he was admitted to WCJ's 1K unit—the unit for incarcerated individuals with "established psychiatric history or problem"—with a diagnosis of major depressive disorder. Upon admission, Mr. Pizarro was displaying "emerging psychosis/possible mania" with behavior "attributable to paranoid and grandiose delusional thinking."

4.      Throughout September 2022 and October 2022—nearly the entirety of his time at WCJ—Mr. Pizarro was housed in either 1K or the Acute Mental Health Unit ("AMHU"), WCJ's most intensive psychiatric unit. Despite housing Mr. Pizarro in the medical unit and AMHU for weeks, WCJ staff never prescribed Mr. Pizarro psychiatric medication, or escalated his care to appropriately treat his serious psychiatric condition, and his condition further deteriorated. Mr. Pizarro routinely flooded his cell with water, refused to engage with nursing staff, and was repeatedly observed speaking to himself.

5.      Although he was seriously decompensating and exhibiting signs of psychosis on September 2, Mr. Pizarro did not see a mental health professional again until October 12—over a month later. At his October 12 evaluation, Mr. Pizarro reported "disturbing" auditory hallucinations, was "oddly related, guarded, internally preoccupied, and [was] noted to have inappropriate affects/smiling inappropriately." A clinician ordered Mr. Pizarro to remain in the AMHU until he had a "decrease[d] risk level of all forms of behavior leading to self-harm." Again, WCJ staff failed to escalate his care to appropriately treat his serious psychiatric condition.

6.      On October 18, 2022, Westchester County ("County") officials requested

that federal authorities transfer Mr. Pizarro to a federal facility.  In a series of emails on October 18, 2022, WCJ and County officials told the United States Marshals Service ("USMS") that Mr. Pizarro was housed in WCJ's "most acute mental health unit" but that, per WCJ's director of mental health, Mr. Pizarro was "psychotic and behaviorally dysregulated in the context of refusing psychiatric treatment" and "should be housed in a facility where he can receive a higher level of care."

7.    In response to the County's request, federal authorities agreed to transfer Mr. Pizarro "ASAP" to the Metropolitan Detention Center ("MDC"), a federal prison in Brooklyn, New York.

8.    Before Mr. Pizarro was transferred to the MDC, WCJ staff was required to complete two forms: a "Special Precautions Form" and a "Prisoner in Transit Medical Summary."  WCJ failed to complete the Special Precautions Form.  WCJ committed a litany of errors on the Prisoner in Transit Medical Summary that obscured that Mr. Pizarro suffered from any mental illness, much less that he was in the throes of an acute mental health crisis necessitating emergency transfer.

9.    The Special Precautions Form is "completed and provided to agencies tasked with transporting inmates . . . to inform them of an inmate's mental health status."  The receiving agency is required to sign the Special Precaution Form to acknowledge "receiving the inmate, special precautions, and medical paperwork."  As a result of WCJ's failure to complete the Special Precautions Form for Mr. Pizarro, MDC's intake staff received no information on Mr. Pizarro's mental health condition or the special psychiatric precautions—his initial placement on suicide watch and then in the 1K and AMHU units—that WCJ had used during Mr. Pizarro's care.

3

10. For its part, a "Prisoner in Transit Medical Summary" physically accompanies a transferred incarcerated person to a new facility, so that care can be coordinated immediately upon arrival. When a federal incarcerated individual is transferred from one facility to another, this Medical Summary provides the immediately available synopsis of the patient's contemporaneous medical status to the receiving institution's staff on transfer day. Per WCJ's own suicide prevention policy, custodial transfer forms—such as the Prisoner in Transit Summary—are "completed and forwarded to ensure that the receiving facility is *immediately* informed of any risk of suicide and/or present or historical psych history."

11. WCJ staff completed the Prisoner in Transit Medical Summary for Mr. Pizarro, but they made at least three critical errors that hid just how mentally ill Mr. Pizarro was.

12. First, WCJ staff left the box for "Suicide watch/psychiatric decompensation within past month" unchecked, even though WJC had placed Mr. Pizarro on suicide watch at WCJ and the reason for his transfer was his active decompensation. This failure meant that the MDC intake staff were not informed that Mr. Pizarro was coming from WCJ's acute mental health unit, that he was actively decompensating, or that he had previously been placed on suicide watch.

13. Second, under "Other Medical Problems," WCJ staff wrote that Mr.

Pizarro had none.  WCJ's statement was false: Mr. Pizarro had a well-known and severe mental illness, was refusing care, and was being transferred to receive a "higher level" of treatment.

| 6a. OTHER MEDICAL PROBLEMS | 6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT (Should match medical problem if applicable) (Include dosage, route, and frequency) | | |
|---|---|---|---|
| Ø medical | Ø medication | | |
| | | | |
| | | | |
| | | | |

14.    WCJ's employees knew the Medical Summary was wrong.  WCJ nurse Helene Bishop, who completed the form and certified it, had personally cared for Mr. Pizarro on at least 21 occasions, from his arrival at WCJ through his transfer.

15.    Third, upon Mr. Pizarro's transfer, WCJ staff also provided MDC with outdated, incomplete, and months-old medical records that incorrectly stated that Mr. Pizarro had neither a history of prior psychiatric hospitalizations nor prior suicide attempts.  Providing these inaccurate records was worse than doing nothing, and numerous available WCJ treatment records accurately described Mr. Pizarro's serious psychiatric condition and history.

16.    WCJ transferred Mr. Pizarro out of the jail to the MDC on October 19, 2022.  Lacking information about Mr. Pizarro's mental health status from WCJ, MDC's frontline intake staff apparently did not conduct an immediate psychiatric screening or place Mr. Pizarro on suicide watch or observation.  Instead, Mr. Pizarro was placed alone in a cell with an institution-issued T-shirt.  Within hours of his transfer to the MDC, Mr. Pizarro hung himself with the T-shirt in his cell.

17.    Defendants were responsible for providing the federal authorities with the correct information needed to protect Mr. Pizarro's health and safety, and to ensure his continuity of care upon his transfer.  Mr. Pizarro was rapidly decompensating and had urgent psychiatric needs—indeed, those needs represented the very reason for the transfer from WCJ to

5

the MDC.  Jail transfer is a known risk factor for suicide, one only aggravated here given Mr. Pizarro's active decompensation, history of severe mental illness, and past suicide attempts. WCJ's staff knew this, and their abject failure to accurately complete the Prisoner in Transit Medical Summary, let alone to complete the Special Precautions Form at all—the most important forms in Mr. Pizarro's transfer—reflected a callous disregard for Mr. Pizarro's health and safety.  So too did WCJ staff's choice to provide the MDC with outdated medical records rather than with the accurate records reflecting Mr. Pizarro's serious mental health needs.

18.     Defendants' acts were negligent, reckless, contrary to sound medical practice, amounted to deliberate indifference to Mr. Pizarro's serious medical needs, and led directly to his death.

19.     This complaint, arising from these tragic and avoidable facts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to applicable state and federal civil rights law.

## **PARTIES**

20.     Daruis M. Pizarro was a citizen of the United States and resided at Westchester County Jail, in Westchester County, and at the Metropolitan Detention Center, in Kings County, at the time these events occurred.

21.     Liza Pizarro is Mr. Pizarro's mother and was duly appointed administrator of his estate on September 25, 2023, by the Surrogate of Bronx County.

22.     Defendant Westchester County ("the County") is a municipal corporation that, through the Westchester County Department of Corrections, operates WCJ.  WCJ and its parent agency are responsible for the provision of medical and mental health care services to prisoners confined at WCJ.  The County contracted with Wellpath Care, a private corporation, to

6

provide such services.

23. Defendants Wellpath LLC and New York Correct Care Solutions Medical Services, P.C. (collectively hereinafter "Wellpath") are private corporations contracted by the County to provide mental health and medical services at WCJ.  On information and belief, Wellpath provided medical and mental health services to incarcerated people at WCJ.  In carrying out its duties, Wellpath was required to ensure that the personnel it employed at WCJ complied with all WCJ policies, procedures, directives, and protocols in addition to all relevant local, state, and federal statutes and regulations.

24. On information and belief, Defendant Wellpath LLC is a foreign limited liability company organized under the laws of Delaware doing business in New York.

25. On information and belief, Defendant New York Correct Care Solutions Medical Services, P.C. is a domestic professional service corporation organized under the laws of the State of New York with its registered agent in New York located in Harrison, Westchester County, New York.

26. On information and belief, Defendant New York Correct Care Solutions Medical Services, P.C. is a subsidiary of Defendant Wellpath LLC.

27. On information and belief, at all relevant times hereto, Defendant Dr. Jerome Norton was a physician employed by Wellpath and the Director of Mental Health at WCJ.

28. On information and belief, Dr. Norton participated in Mr. Pizarro's treatment between August 14 and October 19, 2022.

29. On information and belief, Dr. Norton initiated Mr. Pizarro's transfer to MDC on October 18, 2022.

7

30. Dr. Norton was responsible for the provision of appropriate mental health care to patients at WCJ, including Mr. Pizarro.

31. On information and belief, at all relevant times hereto, Helene Bishop ("Bishop") was a Registered Nurse employed by Wellpath and assigned to WCJ.

32. On information and belief, Bishop participated in Mr. Pizarro's treatment between August 14 and October 19, 2022.

33. On information and belief, Bishop completed Mr. Pizarro's Prisoner in Transit Medical Summary on October 19, 2022.

34. Bishop was responsible for the provision of appropriate mental and medical health care to patients at WCJ, including Mr. Pizarro.

35. On information and belief, at all relevant times hereto, defendants Norton and Bishop ("the Medical Defendants"), employed by Wellpath between August 14 and October 19, 2022, were responsible for the medical and mental health care of inmates at WCJ on those dates and/or participated in, and/or had knowledge of and failed to intervene in, the denial of adequate mental health care to Mr. Pizarro that took place on those dates.  Their duties included but were not limited to caring for all patients in their assigned areas at WCJ, which included but was not limited to cell visits, physical and psychological examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers, direct oversight and supervision of nursing staff, provision of emergency medical care, and/or transfer and discharge planning.

36. At all relevant times hereto, the Medical Defendants were acting under color of state law and within the scope of their capacities as agents, servants, employees, and/or

8

contracted personnel of Defendant County. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of WCJ, including WCJ policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations. The Medical Defendants are sued in their individual capacities.

## JURISDICTION AND VENUE

37.    This action arises under the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. §§ 1983 and 1988, and under New York state common law.

38.    The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1346, 1367(a), and the doctrine of pendent jurisdiction.

39.    The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

40.    Plaintiff demands trial by jury in this action.

## STATEMENT OF FACTS

**Daruis Pizarro psychiatrically decompensates while at WCJ.**

41.    On August 13, 2022, Daruis Pizarro was arrested for Hobbs Act Robbery. He was admitted to WCJ as a federal pre-trial detainee on August 14, 2022. He was 22 years old.

42.    Mr. Pizarro's August 14, 2022 intake assessment states that upon arriving at WCJ, Mr. Pizarro appeared anxious, afraid, and/or angry, that this was his first arrest, that he had a history of psychiatric hospitalization as recently as the month prior, that he had attempted suicide at least once before, and that he was "requesting to speak to mental health." As a result of the intake assessment, Mr. Pizarro was placed on suicide watch.

9

43.     Dr. Raul Ulloa, a physician employed by Wellpath WCJ's medical director, approved Mr. Pizarro's placement on suicide watch.

44.     On August 14, 2022, Matthew A. Aronoff, MHP ("Aronoff"), categorized Mr. Pizarro as "Mental Health 1: Crisis-level mental disorder (acute condition, temporary classification)." Aronoff conducted a "Suicide Watch Initial Assessment" for Mr. Pizarro and noted that Mr. Pizarro had six suicide risk factors: (1) age; (2) gender; (3) being new to the facility; (4) first incarceration or arrest; (5) legal concerns; and (6) restrictive housing placement. No protective factors were noted. Aronoff's notes show that Mr. Pizarro refused to discuss a collaborative safety plan. Aronoff also noted that a review of Mr. Pizarro's intake assessment indicated a past suicide attempt and recent psychiatric hospitalization. Despite separately noting Mr. Pizarro's past suicide attempt and hospitalization, Aronoff failed to tick the "prior suicide attempts" and "psychiatric hospitalization" boxes in the suicide risk factor field of Mr. Pizarro's initial suicide watch assessment. Aronoff classified Mr. Pizarro as an "intermediate risk" of self-harm, referred him to psychiatry, and ordered four interventions: (1) daily meetings with a mental healthcare professional; (2) developing a collaborative safety plan while on suicide watch; (3) a consultation with psychiatry regarding medication; and (4) CBT/DBT skills.

45.     Mr. Pizarro's August 15, 2022 Suicide Watch Daily Follow-Up noted eight risk factors: (1) age; (2) gender; (3) being new to the facility; (4) first incarceration or arrest; (5) legal concerns; (6) restrictive housing placement; (7) prior suicide attempts/suicide note found; and (8) psychiatric hospitalization. Mr. Pizarro continued to refuse a collaborative safety plan. Mr. Pizarro's suicide risk level was rated low, but his suicide watch was continued. He was given three treatment objectives—that he would not engage in self-harming behavior; that he would tell staff if he had suicidal ideation; and that he would take medication prescribed

10

by psychiatry—and three interventions: daily meetings with a mental healthcare professional; CBT/DBT skills; and a risk assessment.

46.    On August 16, 2022, Defendant Dr. Jerome Norton discharged Mr. Pizarro from suicide watch.  Defendant Norton's August 16 notes identified only three risk factors: first incarceration or arrest, gender, and contradictory self-reports regarding Mr. Pizarro's history of psychiatric treatment and suicide attempts.  Defendant Norton completed a collaborative safety plan with Mr. Pizarro, rated Mr. Pizarro's suicide risk as low, and discharged him from suicide watch.  Defendant Norton ordered two interventions: a consultation with psychiatry regarding medications and CBT/DBT skills.

47.    On August 17, 2022, Linda Unneland, MHP ("Unneland"), recorded a mental health progress note for Mr. Pizarro.  She noted that Mr. Pizarro had been placed on suicide watch due to "risk factors including being new to the facility, history of psychiatric hospitalization [in] the preceding month" due to depressive symptoms and "having a history of at least one suicide attempt."  Unneland noted that Mr. Pizarro described "feeling depressed but denied [suicidal ideation]."  Per Unneland's notes, Mr. Pizarro denied being on psychiatric medication in the past and "rejected this as an option currently."

48.    On August 26, 2022, Michael Kunz, MHP ("Kunz"), conducted Mr. Pizarro's psychiatric referral and completed a "Psychiatric Initial Observation" of Mr. Pizarro. Kunz noted that Mr. Pizarro had a history of major depressive/dysthymic symptoms as well as psychotic symptoms, including hearing voices two years prior.  Kunz incorrectly noted that Mr. Pizarro had never been psychiatrically hospitalized and that he had no prior suicide attempts.  He diagnosed Mr. Pizarro with an unspecified mood disorder and determined that treatment was not indicated.  Per Kunz's notes, Mr. Pizarro denied ever taking psychiatric medications.

11

49. Kunz did not document any discussion with Mr. Pizarro about commencing medication as a treatment option and/or prescribe Mr. Pizarro medication.

50. Within a week of Kunz's consultation and conclusion that Mr. Pizarro required no treatment or medication, Mr. Pizarro was exhibiting signs of psychosis.

51. On September 1, 2022, Unneland assessed Mr. Pizarro after an incident following his transfer to general population. Mr. Pizarro was "repeatedly heard to be rambling" and was exhibiting delusional behavior, stating "I shouldn't be here at all" in reference to his incarceration and "I need to be elevated. I'm king." Unneland noted that Mr. Pizarro "denied the presence of psychotic symptoms, but he may be under-reporting symptoms." She classified Mr. Pizarro as "MH2: Mental health disorder severe enough to require ongoing intensive mental health treatment; almost always on psychotropic medication" and transferred Mr. Pizarro to the "2G Special Housing unit."

52. Unneland did not document any discussion with Mr. Pizarro about commencing medication as a treatment option and/or prescribe Mr. Pizarro medication.

53. On September 2, 2022, Defendant Norton filed a Mental Health Progress Note indicating that Mr. Pizarro had been involved in a fight and "presented as manic." Defendant Norton noted that during the assessment Mr. Pizarro "who is small in stature, was physically threatening the largest of the ESU team." Defendant Norton concluded that Mr. Pizarro appeared to "pose a danger to others based on this pattern of behavior which appears attributable to paranoid and delusional thinking." Defendant Norton's notes indicate that Mr. Pizarro was initially transferred to the AMHU and then to 1K with "ESP status." Incarcerated people housed in 1K "generally have an established psychiatric history or problem." Defendant Norton noted that Mr. Pizarro would be "re-evaluated by Psychiatry in light of emerging

12

psychosis/possible mania."

54.    Upon information and belief, Mr. Pizarro was admitted to the 1K "Med Unit" on September 2, 2022, with a diagnosis of major depressive disorder.

55.    On information and belief, throughout September and early October 2022, Mr. Pizarro was housed in the 1K unit or the AMHU.

56.    On information and belief, despite being housed in 1K and/or AMHU for over a month and despite Mr. Pizarro's suicide watch treatment plans ordering daily meetings with a mental healthcare professional, Defendant Norton's September 2 referral to psychiatry, and Mr. Pizarro's active and rapid decompensation, Defendant Norton failed to arrange for Mr. Pizarro to be re-evaluated by psychiatry or to receive any mental health care for the next 40 days.

57.    Mr. Pizarro did not meet with a mental healthcare clinician for more than a month between September 2, 2022 and October 12, 2022.

58.    During this period, Mr. Pizarro was supervised exclusively by nurses.

59.    During this period, Mr. Pizarro repeatedly flooded his cell with water, refused to cooperate with staff, and requested Ensure to counter his weight loss.  For example, in an October 6, 2022 request form reviewed by Defendant Helene Bishop, RN, and Ulloa, Mr. Pizarro asked for Ensure, scribbling "Hunger strike Starvation Food" in the margin.

60.    On October 12, 2022—40 days after Mr. Pizarro began exhibiting signs of psychosis and Defendant Norton made a psychiatry referral—Jennifer Maple, LCSW ("Maple"), conducted a Mental Health Initial Assessment and Treatment Plan for Mr. Pizarro.

61.    During the assessment, Mr. Pizarro reported a history of schizophrenia characterized by agitation and auditory hallucinations of "disturbing" content and told LCSW Maple that he was actively experiencing auditory hallucinations.  Mr. Pizarro also reported a

13

four-day psychiatric hospitalization in 2019 and that he was non-compliant with his treatment plan following discharge.  Maple noted that Mr. Pizarro appeared "oddly related, somewhat evasive, internally preoccupied" and was "smiling inappropriately during [the] evaluation."  Mr. Pizarro presented with "sexually preoccupied thought content and mild paranoia."  From her chart review, Maple determined that Mr. Pizarro was "a poor historian likely secondary to psychosis."  She also noted that review of Mr. Pizarro's screening documents indicated a history of suicide attempts.  Maple encouraged Mr. Pizarro to "consider psychotropic medication trial."  She ordered Mr. Pizarro's AMHU placement be maintained for a "higher level of MH treatment and monitoring."  Maple concluded that Mr. Pizarro required intensive mental health monitoring due to "Decompensation/Acute Altered Mental Status" and that Mr. Pizarro should be maintained in the AMHU until he had a "decrease[d] risk level of all forms of behavior leading to self-harm" and "adhere[d] to psychotropic medication as directed by health care practitioner."

62.     Despite this order, upon information and belief, Mr. Pizarro was never prescribed any psychotropic medication.  No WCJ staff escalated his care to appropriately treat his serious psychiatric condition.

63.     Mr. Pizarro continued to deteriorate.  On October 13, 14, and 17, 2022, Defendant Bishop observed Mr. Pizarro "standing at [the] door, talking to himself."

**Westchester County Jail requests a transfer for Mr. Pizarro.**

64.     On October 18, 2022, on information and belief, Defendant Norton inquired over email with Westchester County officials whether Mr. Pizarro could be transferred to federal custody.  In his email to County officials, he wrote: "I am unable to recommend a 730 exam for this patient (who is refusing voluntary psychiatric treatment).  Is there a means of

14

returning him to the Feds so they can provide the higher level of care that he needs?"

65.     Defendant Norton documented no clinical notes regarding his recommendation that Mr. Pizarro be transferred out of WCJ back to federal custody to receive a higher level of care, or what efforts if any he had made to obtain a higher level of care for Mr. Pizarro at WCJ.

66.     On October 18, 2022, Westchester County's Booking and Transportation Operations department forwarded Defendant Norton's email to federal authorities, adding that Mr. Pizarro was "currently housed in our forensic unit, which is our most acute mental health unit.  Per our director of Mental Health [on information and belief Defendant Norton], he should be housed in a facility where he can receive a higher level of care."

67.     On information and belief, Defendant Norton sent an additional email further explaining to the USMS that "Mr. Pizarro is psychotic and behaviorally dysregulated in the context of refusing voluntary psychiatric treatment."

68.     On October 18, 2022, federal authorities ordered transfer of Mr. Pizarro "to MDC Brooklyn ASAP."

**The Medical Defendants transfer Mr. Pizarro with no "Special Precautions Form" and with an erroneous and misleading "Prisoner in Transit Medical Summary" form.**

69.     Mr. Pizarro was transferred from WCJ to the MDC on the morning of October 19, 2022.

70.     Upon transfer of an incarcerated person, WCJ's Suicide Prevention and Crisis Prevention policy requires interagency notification of mental health status and suicide risk via custodial transfer forms and "Special Precaution" forms.  Custodial transfer forms "are completed and forwarded to ensure that the receiving facility is *immediately* informed of any risk of suicide and/or present or historical psych history."  Meanwhile, the Special Precaution form is

15

provided to the transporting authorities "to inform them of an inmate's mental health status."

71.    As WCJ's own policies recognize, when a federal incarcerated individual is transferred from one facility to another, custodial transfer forms like the Prisoner in Transit Medical Summary provide the immediately available synopsis of the patient's contemporaneous medical status to the receiving institution's staff on transfer day.

72.    On information and belief, the Medical Defendants failed to complete a Special Precaution form for Mr. Pizarro even though Mr. Pizarro had spent almost the entirety of his two months at WJC on suicide watch or in the 1K and AMHU units.

73.    Defendant Bishop completed and signed the Prisoner in Transit Medical Summary that accompanied Mr. Pizarro.

74.    The Prisoner in Transit Medical Summary form was the only medical form about Mr. Pizarro immediately available to the MDC's intake staff on October 19, 2022.

75.    The Medical Defendants failed to accurately complete the Prisoner in Transit Medical Summary form.  The form was riddled with errors and, of all of Mr. Pizarro's WCJ medical records, included only two outdated, inaccurate, and incomplete medical records that obscured his psychiatric condition and risk of suicide.

76.    The Prisoner in Transit Medical Summary form's instructions specifically provided: "BOX 3: The goal of this section is to identify recent medical conditions or changes in medical conditions that might impact the transfer of a prisoner. Positive responses in this section should be further explained in BOX 7 (COMMENTS)."  One of the relevant conditions identified in Box 3 is "Suicide watch/psychiatric decompensation within past month."

77.    Defendant Bishop failed to tick the box for "Suicide watch/psychiatric decompensation within past month."

16

78.    Instead, Defendant Bishop erroneously documented that Mr. Pizarro had *no* medical conditions.

79.    Defendant Bishop knew these representations were false because she had personally been responsible for Mr. Pizarro's care on at least 21 occasions between August 14 and October 17, 2022, had observed Mr. Pizarro speaking to himself numerous times, was aware that he had spent over a month in the medical unit and/or the AMHU, and was aware that he had an unspecified mood disorder diagnosis.

80.    To make matters worse, the only medical records attached to the Prisoner in Transit Summary were (1) an August 29, 2022 Health and Physical Assessment that erroneously reported that Mr. Pizarro had never attempted suicide and had no history of psychiatric hospitalization and (2) an incomplete version of Kunz's August 26, 2022 Psychiatric Initial Evaluation, which likewise erroneously indicated no history of suicide or psychiatric hospitalization.

81.    WCJ and Wellpath policy also requires that an incarcerated person's mental health score be "included on *all transfer letters* as these scores are used by all prisons in the state of New York" (emphasis in original).  The Medical Defendants failed to include Mr. Pizarro's MH2 score—*i.e.*, "mental health disorder severe enough to require specialized housing AND ongoing intensive mental health treatment; almost always on psychotropic medication"— on *any* of the paperwork sent to MDC.

82.    Despite transferring Mr. Pizarro for the very purpose of receiving a higher level of mental health care due to his decompensation and psychosis, the Medical Defendants did not provide a single medical record addressing Mr. Pizarro's severe psychiatric decline.

83.    As Mental Health Director and as the physician who had initiated Mr.

17

Pizarro's transfer in the first place, Defendant Norton was responsible for ensuring that WCJ did everything necessary to ensure Mr. Pizarro's safety during transfer and his continuity of care. Defendant Norton failed to take the most basic steps to effect Mr. Pizarro's transfer in a safe or competent manner.

**Mr. Pizarro dies by suicide within hours of arriving at MDC.**

84.    As a result of the Medical Defendant's failure to accurately complete the Prisoner in Transit Medical Summary and their inclusion of outdated and misleading medical records, MDC's intake staff did not know of Mr. Pizarro's unstable psychiatric state when he arrived at the MDC on October 19, 2022.

85.    Unless specific psychiatric concerns indicate otherwise, BOP policy does not require an immediate psychological assessment for transferred incarcerated people.  Instead, BOP policy specifies that a Transfer Intake Screening need only occur within 30 days of transfer to a new institution.

86.    On information and belief, once at MDC, Mr. Pizarro was placed unguarded and alone in a cell with an institution-issued T-shirt.

87.    At approximately 4 p.m. on October 19, 2022, Mr. Pizarro was found hanging in his cell at the MDC.  He had used the institution-issued T-shirt to hang himself.  He was 22 years old.

88.    Mr. Pizarro was officially pronounced dead at NYU Langone in Brooklyn at 5:15 p.m. on October 19, 2022.

**Plaintiff's Notices of Claim**

89.    Within 90 days of Ms. Pizarro's appointment as administrator of Mr. Pizarro's estate, written notice of claim for his wrongful death caused by Defendants'

18

negligence, recklessness, deliberate indifference, and wrongful breach of duties, sworn to by Ms. Pizarro, was served upon the County.

90.    At least thirty days have elapsed since service of the notice of claim, and adjustment or payment of the claim has been neglected or refused.

91.    On January 8, 2024, an order of the Supreme Court of the State of New York, Westchester County, granted Petitioner leave to serve as timely a Notice of Claim proposed at Index No. 65521/2023, NYSCEF Doc. No. 5, for, *inter alia*, conscious pain and suffering, pursuant to N.Y. Mun. Law § 50-e(5), which Plaintiff then filed and served.

92.    Plaintiff files this complaint within one year and ninety days of Mr. Pizarro's death.

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983 – Fourteenth Amendment
Deliberate Indifference to Serious Medical Needs
(Against the Medical Defendants)

93.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

94.    As a result of Defendant Norton's failure to provide Mr. Pizarro with adequate psychiatric and mental health care while he was confined at the WCJ, and/or exhibiting deliberate indifference to Mr. Pizarro's rights by not acting on information which indicated that unconstitutional acts were occurring, Defendant Norton deprived Mr. Pizarro of rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendments to the United States Constitution.

95.    As a result of Medical Defendants' failure to conduct the transfer of Mr. Pizarro, including their failure to provide federal authorities with a Special Precaution form, their

19

failure to accurately complete the Prisoner in Transit Medical Summary, and their inclusion of outdated, inaccurate, and incomplete medical records, the Medical Defendants deprived Mr. Pizarro of rights, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendments to the United States Constitution.

96.     The Medical Defendants committed these errors even though the Medical Defendants had themselves initiated Mr. Pizarro's transfer to the MDC for the very purpose of him receiving mental health care and despite the Medical Defendants' extensive and personal knowledge of Mr. Pizarro's history of suicide attempts, psychiatric hospitalization, placement on suicide watch, and rapidly declining psychiatric condition while at WCJ.  Defendants' conduct constituted deliberate indifference to Mr. Pizarro's serious medical needs.

97.     The Medical Defendants acted at all times relevant hereto willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal deliberate indifference to the clear risk of death or serious injury to Mr. Pizarro.

98.     As a direct and proximate result of the Medical Defendants' violations of Mr. Pizarro's constitutional rights, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

### SECOND CAUSE OF ACTION
Negligence
(Against All Defendants)

99.     Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

100.    Defendants owed a duty of care to Mr. Pizarro as a pre-trial detainee at WCJ.

20

101. Defendants breached the duty of care that they owed to Mr. Pizarro by failing to provide for his continuity of care, failing to provide medical and mental health treatment, and/or otherwise neglecting his medical and mental health needs.

102. Defendants' breach of their duty of care was the proximate cause of Mr. Pizarro's serious and unnecessary injuries, including severe pain and suffering and death.

103. Defendants Wellpath and New York Correct Care Solutions Medical Services, P.C., as employer(s) of all or some of the Medical Defendants, are responsible for their negligence under the doctrine of *respondeat superior*.

104. Defendant County is also responsible for Defendants Wellpath's, New York Correct Care Solutions Medical Services, P.C.'s, and the Medical Defendants' negligence because it retained them to perform services that the County had undertaken to perform and was under a special duty and legal obligation to perform.

105. As a direct and proximate result of the misconduct and neglect detailed above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

**THIRD CAUSE OF ACTION**
Medical Malpractice—CPLR 214-a
(Against All Defendants)

106. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

107. At all times relevant to this Complaint, the County undertook to provide medical and mental health care to incarcerated people in its custody at WCJ, including Mr. Pizarro, and it was legally obligated and had a special duty to do so effectively.

108. The Medical Defendants and Defendants Wellpath and New York Correct

Care Solutions Medical Services, P.C. were employed, retained and/or contracted by the County to provide medical and mental health care to all incarcerated people in the care and custody of the County at WCJ, including Mr. Pizarro.

109. The Medical Defendants and Defendants Wellpath and New York Correct Care Solutions Medical Services, P.C. agreed and purported to provide medical care and services to incarcerated people in WCJ, including Mr. Pizarro, from August 14, 2022, until October 19, 2022.

110. The Medical Defendants and Defendants Wellpath and New York Correct Care Solutions Medical Services, P.C. held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and that they undertook to use reasonable care and diligence in the care and treatment of people incarcerated at WCJ, including Mr. Pizarro.

111. The Medical Defendants and Defendants Wellpath and New York Correct Care Solutions Medical Services, P.C. were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Pizarro.

112. Defendants Wellpath and New York Correct Care Solutions Medical Services, P.C., are employer of some or all of the Medical Defendants, is responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

113. Defendant County, as employer of some or all of the Medical Defendants is responsible for their negligence wrongdoing under the doctrine of *respondeat superior*.

114. Defendant County is also responsible for Defendants Wellpath's, New York Correct Care Solutions Medical Services, P.C.'s, and the Medical Defendants' negligence and wrongdoing because it retained them to perform services that the County had undertaken to

22

perform and was under a special duty and legal obligation to perform.

115. As a direct and proximate result of Defendants' medical malpractice, negligence, carelessness, and unskillfulness, Mr. Pizarro suffered physical injury, severe pain and suffering, conscious pain and suffering, emotional distress, monetary damages, and death.

116. A Certificate of Merit pursuant to Section 3012-a of the New York Civil Practice Law and Rules is annexed to this Complaint.

## FOURTH CAUSE OF ACTION
Wrongful Death
N.Y. Estates, Powers, and Trusts Law § 5-4.1 et seq
(Against All Defendants)

117. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

118. As a direct and proximate result of Defendants' negligence and misconduct detailed above, the statutory distributees of Mr. Pizarro's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, life, and support of Mr. Pizarro.

119. Defendants are liable for the wrongful death of Mr. Pizarro.

## FIFTH CAUSE OF ACTION
Conscious Pain and Suffering
(Against All Defendants)

120. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

121. As a direct and proximate result of Defendants' negligence and misconduct alleged above, Mr. Pizarro suffered physical injury, conscious pain and suffering, emotional distress, and death.

23

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

1.    Awarding compensatory damages in an amount to be determined at trial;

2.    Awarding punitive damages against Wellpath and the Medical Defendants in an amount to be determined at trial;

3.    Awarding plaintiff reasonable attorneys' fees and costs under, *inter alia*, 42 U.S.C. § 1988; and

4.    Directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and disbursements of this action.

Dated:  January 16, 2024
        New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP


_____/s_____
Katherine Rosenfeld
Ariadne M. Ellsworth
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Liza Pizarro, as Administrator of the Estate of Her
Son, Daruis M. Pizarro,

     Plaintiff,

  -against-

WESTCHESTER COUNTY; WELLPATH LLC;
NEW YORK CORRECT CARE SOLUTIONS
MEDICAL SERVICES, P.C.; DR. JEROME
NORTON; and HELENE BISHOP, R.N.,

     Defendants.

Case No. _____

**CERTIFICATE OF MERIT**

KATHERINE ROSENFELD, an attorney duly admitted to practice law before the courts of the State of New York, hereby affirms, pursuant to CPLR 3012-a, as follows:

1. I am a partner at the law firm of Emery Celli Brinckerhoff Abady Ward & Maazel LLP, counsel for Plaintiff in this action.

2. I have secured records relating to the death of Daruis M. Pizarro, including records from the Westchester County Jail and Wellpath. I have reviewed the facts of this case and have consulted with at least one physician who is licensed to practice in this State, and I reasonably believe that said physician is knowledgeable as to the relevant issues involved in this particular action.

3. I have concluded on the basis of such review and consultation that there is a reasonable basis for the commencement of this action.

Dated: January 16, 2024
   New York, New York

           _____/s_____
           Katherine Rosenfeld