UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LIZA PIZARRO as Administrator of the Estate of Daruis M. Pizarro,<br><br>　　　　　　　　　Plaintiff,<br><br>　　– against –<br><br>WESTCHESTER COUNTY; NEW YORK CORRECT CARE SOLUTIONS MEDICAL SERVICES, P.C., WELLPATH LIQUIDATING TRUST, DR. JEROME NORTON; HELENE BISHOP, R.N.; and THE UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Defendants. | 24 Civ. 331 (KMK) (JCM)<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY DEMAND**<br><br>**ECF CASE** |

## PRELIMINARY STATEMENT

1.　　This is a civil rights action brought by Plaintiff Liza Pizarro as Administrator of the Estate of her son Daruis M. Pizarro.  Mr. Pizarro died by suicide on October 19, 2022, at the Metropolitan Detention Center ("MDC") in Brooklyn, New York, while he was a federal pre-trial detainee.  Mr. Pizarro was just 22 years old.  He had been incarcerated for two months.  Mr. Pizarro's tragic, preventable, and premature death occurred because each Defendant failed to provide him with basic mental health care while he was in their custody and as they transferred him between jails, despite his severe psychiatric illness, his known need for heightened care and supervision, and his profound risk of suicide.

2.　　Mr. Pizarro was arrested on federal robbery charges on August 12, 2022. The United States Marshals Service ("USMS"), the federal agency responsible for housing, transporting, and caring for prisoners in federal custody until they are transferred to the custody of the federal Bureau of Prisons ("BOP"), placed Mr. Pizarro at the Westchester County Jail

1

("WCJ") beginning on August 14, 2022. At admission, Mr. Pizarro informed WCJ staff that he was depressed, had been psychiatrically hospitalized a month prior, and had made at least one previous suicide attempt. As a result, WCJ classified Mr. Pizarro as having a "crisis-level mental disorder" and placed him on suicide watch. Mr. Pizarro remained on suicide watch until August 16, 2022, when he was discharged to mental health housing.

3. After Mr. Pizarro was released from suicide watch, a psychiatric provider evaluated Mr. Pizarro but failed to order either treatment or medication. Predictably, Mr. Pizarro's mental health further deteriorated. By September 2, 2022, he was admitted to WCJ's 1K unit—the unit for inmates with an "established psychiatric history or problem." Upon admission, Mr. Pizarro was displaying "emerging psychosis/possible mania" with behavior "attributable to paranoid and grandiose delusional thinking."

4. Throughout September 2022 and October 2022—nearly the entirety of his time at WCJ—Mr. Pizarro was housed in either 1K or the Acute Mental Health Unit ("AMHU"), WCJ's most intensive psychiatric unit. Mr. Pizarro routinely flooded his cell with water, refused to engage with nursing staff, and was repeatedly observed speaking to himself. Although he was seriously decompensating and exhibiting signs of psychosis, Mr. Pizarro did not see a mental health professional again for over a month—until October 12, 2022. At this evaluation, Mr. Pizarro reported "disturbing" auditory hallucinations, was "oddly related, guarded, internally preoccupied, and [was] noted to have inappropriate affects/smiling inappropriately." A clinician ordered Mr. Pizarro to remain in the AMHU until he had a "decrease[d] risk level of all forms of behavior leading to self-harm."

5. On October 18, 2022, WCJ officials requested that the USMS take Mr. Pizarro back into its custody. In a series of emails on October 18, 2022, WCJ officials told

2

USMS officials that Mr. Pizarro was housed in WCJ's "most acute mental health unit" but that, per WCJ's director of mental health, "he should be housed in a facility where he can receive a higher level of care." In response to WCJ's request, the USMS officials agreed to transfer Mr. Pizarro "ASAP" to the MDC, a federal prison in Brooklyn, New York, operated by the BOP. His transfer was scheduled for October 19, 2022.

6.     Despite knowing that the entire purpose of Mr. Pizarro's transfer was to receive urgent psychiatric care, USMS officials failed to inform anyone at BOP about Mr. Pizarro's severe mental health condition or the reason for his transfer. Compounding these errors, USMS officials completed several forms (which went to the BOP) that affirmatively stated that Mr. Pizarro had "No Medical Conditions on Record," even though only hours earlier the very same USMS officials had been alerted to Mr. Pizarro's severe psychiatric decompensation.

7.     Meanwhile, WCJ staff also failed to properly complete crucial transfer paperwork. They failed to complete a Special Precautions Form which is specifically designed to provide information about a transferring inmate's mental health status to the transporting agency, and they committed a litany of errors on the "Prisoner in Transit Summary" that obscured that Mr. Pizarro suffered from any mental illness, much less that he was in the throes of an acute mental health crisis necessitating emergency transfer.

8.     A "Prisoner in Transit Medical Summary" physically accompanies a transferred inmate to a new facility, so that care can be coordinated immediately upon arrival. When a federal prisoner is transferred from one facility to another, this Medical Summary provides the immediately available synopsis of the patient's contemporaneous medical status to the receiving institution's staff on transfer day. Per WCJ's own suicide prevention policy,

3

custodial transfer forms—such as the Prisoner in Transit Summary—are "completed and forwarded to ensure that the receiving facility is *immediately* informed of any risk of suicide and/or present or historical psych history." Mr. Pizarro's Prisoner in Transit Summary contained three critical errors that hid just how mentally ill Mr. Pizarro was.

9. First, the WCJ staff left the box for "Suicide watch/psychiatric decompensation within past month" unchecked, even though Mr. Pizarro had been on suicide watch at WCJ and the reason for his transfer was his active decompensation. This failure meant that the MDC intake staff were not informed that Mr. Pizarro was coming from WCJ's acute mental health unit, that he was actively decompensating, or that he had previously been placed on suicide watch.

**3. CURRENT MEDICAL ISSUES**

Check all that apply to the prisoner and explain in the comments section:

- ☐ Hospitalizations within past month
- ☐ Seizure activity within past month
- ☐ Seizure disorder requiring medications
- ☐ Limited mobility (crutches, wheelchair)
- ☐ Has hard or air cast, splint or brace
- ☐ Prescription narcotic pain medications dispensed for travel
- ☐ Suicide watch/psychiatric decompensation within past month

- ☐ Contagious illness or quarantine within past month
- ☐ Cardiac chest pain within past month
- ☐ Stroke within past month
- ☐ Surgery within past month
- ☐ Diabetes requiring insulin or other medications

FEMALE PRISONERS: Is prisoner pregnant?  ☐ NO · ☐ YES   If yes, how many weeks? _____

10. Second, under "Other Medical Problems," WCJ staff wrote that Mr. Pizarro had none. This statement was false: Mr. Pizarro had a well-known and severe mental illness, was refusing care, and was being transferred to receive a 'higher level" of treatment.

| 6a. OTHER MEDICAL PROBLEMS. | 6b. MEDICATIONS DISPENSED WITH PRISONER FOR TRANSPORT. (Should match medical problem if applicable) (Include dosage, route, and frequency) | | |
|---|---|---|---|
| Ø Medical | Ø medication | | |
| | | | |
| | | | |
| | | | |

11.    The WCJ staff knew the Medical Summary they completed was wrong. Defendant Registered Nurse Helene Bishop, who completed the form and certified it, had personally cared for Mr. Pizarro on at least 21 occasions, from his arrival at WCJ and placement on suicide watch through the days leading to his transfer.

12.    Third, upon Mr. Pizarro's transfer, WCJ staff also provided MDC with only 13 pages of a 157-page medical record. These 13 pages were outdated, incomplete, and months-old medical records from August 2022 that incorrectly stated that Mr. Pizarro had neither a history of prior psychiatric hospitalizations nor prior suicide attempts.  Providing these documents was worse than doing nothing.  WCJ's decision to send these outdated and inaccurate records was especially egregious because numerous WCJ treatment records accurately described Mr. Pizarro's serious psychiatric condition and history.

13.    USMS transferred Mr. Pizarro out of the WCJ to the MDC on October 19, 2022.  Mr. Pizarro was emotionally disturbed during the transport to the MDC.  Despite Mr. Pizarro's obviously altered mental state, the MDC's staff apparently did not conduct an adequate psychiatric screening or place Mr. Pizarro on suicide watch or observation.  Instead, Mr. Pizarro was placed alone in a cell with an institution-issued T-shirt and left unattended for long enough that he was able to successfully hang himself.  Within hours of his transfer to the MDC, Mr. Pizarro hanged himself with the T-shirt in his cell.

14.    All Defendants were aware of Mr. Pizarro's urgent mental health needs on the day of his death.  All Defendants were responsible for protecting Mr. Pizarro's health and safety when he was transferred from one jail to another amid a severe psychiatric crisis, and for ensuring the continuity of his care between institutions.  All Defendants abjectly failed to ensure that basic psychiatric information made its way with Mr. Pizarro and instead provided

affirmatively misleading information that Mr. Pizarro had no mental health conditions.  Mr. Pizarro was rapidly decompensating and had urgent psychiatric needs—indeed, those needs represented the very reason for the transfer from WCJ to the MDC.  Jail transfer is a known risk factor for suicide, one aggravated here by Mr. Pizarro's active decompensation, history of severe mental illness, and past suicide attempts.  Defendants' acts and omissions reflected a callous disregard for Mr. Pizarro's health and safety.

15.      Defendants' acts were negligent, reckless, and contrary to sound medical practice, amounted to deliberate indifference to Mr. Pizarro's serious medical needs, and caused his death.  Each Defendant's negligent acts and omissions was an independent and substantial factor in Mr. Pizarro's death.  This complaint, arising from these tragic and avoidable facts, seeks compensatory and punitive damages, costs, disbursements, and attorneys' fees pursuant to applicable state and federal civil rights law.

## PARTIES

16.      Daruis M. Pizarro was a citizen of the United States and resided at Westchester County Jail, in Westchester County, and at the Metropolitan Detention Center, in Kings County, at the time these events occurred.

17.      Liza Pizarro is Mr. Pizarro's mother and was duly appointed administrator of his estate on September 25, 2023, by the Surrogate of Bronx County.

18.      Defendant Westchester County (the "County") is a municipal corporation that through the Westchester County Department of Corrections operates WCJ.  WCJ and its parent agency are responsible for the provision of medical and mental health care services to prisoners confined at WCJ.  The County contracted with Wellpath LLC and New York Correct Care Solutions Medical Services, P.C., both private corporations, to provide such services.

19.    Defendant New York Correct Care Solutions Medical Services, P.C. ("NYCCSMS") is a private corporation contracted by the County to provide mental health and medical services at WCJ.  On information and belief, NYCCSMS, provided medical and mental health services to prisoners at WCJ.  In carrying out its duties, NYCCSMS was required to ensure that the personnel it employed at WCJ complied with all WCJ policies, procedures, directives, and protocols in addition to all relevant local, state, and federal statutes and regulations.

20.    On information and belief, Defendant NYCCSMS is a domestic professional service corporation organized under the laws of the State of New York with its registered agent in New York located in Harrison, Westchester County, New York.

21.    Defendant Wellpath Liquidating Trust ("Wellpath Trust") is a legal entity established as part of Wellpath LLC's Chapter 11 bankruptcy reorganization plan. On information and belief, Wellpath LLC provided medical and mental health services to prisoners at WCJ. The Wellpath Trust was created to assume and administer assets and liabilities of Wellpath LLC, including wrongful death claims arising from Wellpath LLC's operations prior to bankruptcy. Pursuant to the Order issued by the United States Bankruptcy Court for the Southern District of Texas confirming the Chapter 11 Plan of Reorganization, holders of wrongful death claims may seek determinations of liability with the Wellpath Trust as a nominal party. *In re Wellpath Holdings, Inc., et. al.*, 24-90533, Dkt. 2907, (S.D.Tex. Jun. 4, 2025).On information and belief, at all relevant times hereto, Defendant Dr. Jerome Norton was a physician employed by Wellpath LLC and the Director of Mental Health at WCJ.

22.    On information and belief, Dr. Norton participated in Mr. Pizarro's treatment between August 14 and October 19, 2022.

7

23.    On information and belief, Dr. Norton initiated Mr. Pizarro's transfer to MDC on October 18, 2022.

24.    Dr. Norton was responsible for the provision of appropriate mental health care to patients at WCJ, including Mr. Pizarro.

25.    On information and belief, at all relevant times hereto, Helene Bishop was a Registered Nurse employed by Wellpath LLC and assigned to WCJ.

26.    On information and belief, Bishop participated in Mr. Pizarro's treatment between August 14 and October 19, 2022.

27.    On information and belief, Bishop completed Mr. Pizarro's Prisoner in Transit Medical Summary on October 19, 2022.

28.    Bishop was responsible for the provision of appropriate mental and medical health care to patients at WCJ, including Mr. Pizarro.

29.    On information and belief, at all relevant times hereto, defendants Norton and Bishop ("the Medical Defendants"), employed by Wellpath LLC between August 14 and October 19, 2022, were responsible for the medical and mental health care of inmates at WCJ on those dates and/or participated in, and/or had knowledge of and failed to intervene in, the denial of adequate mental health care to Mr. Pizarro that took place on those dates.  Their duties included but were not limited to caring for all patients in their assigned areas at WCJ, which included but was not limited to cell visits, physical and psychological examinations, identification of acute and chronic conditions, design and implementation of appropriate plans to facilitate care, provision of medications, provision of psychiatric and/or psychological counseling, coordination of treatment with other providers, direct oversight and supervision of nursing staff, provision of emergency medical care, and/or transfer and discharge planning.  At

all relevant times hereto, the Medical Defendants were acting under color of state law and within the scope of their capacities as agents, servants, employees, and/or contracted personnel of Defendant County. Their responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of WCJ, including WCJ policies, procedures, directives, and protocols, in addition to all relevant local, state, and federal statutes and regulations. The Medical Defendants are sued in their individual capacities.

30. At all times relevant to this Complaint, Defendant United States of America acted for all relevant purposes here through the USMS and BOP.

31. The USMS is a duly established agency of the United States responsible for housing, transporting, and caring for prisoners in federal custody until they are transferred to the custody of the BOP.

32. All conduct by individual USMS personnel alleged herein occurred in the scope of the respective individuals' office or employment with the USMS.

33. The BOP is a duly established agency of the United States responsible for providing safe and humane conditions of confinement for federal prisoners and for providing adequate mental health care to prisoners who require it.

34. All conduct by individual BOP personnel alleged herein occurred in the scope of the respective individuals' office or employment with the BOP.

## JURISDICTION AND VENUE

35. This action arises under the Federal Torts Claim Act ("FTCA"), the Fourteenth Amendment to the United States Constitution, under 42 U.S.C. §§ 1983 and 1988, New York state common law, and the New York Constitution.

36. The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331

(federal question jurisdiction), 1346 (United States as defendant), 1367(a) (supplemental jurisdiction), and the doctrine of pendent jurisdiction.

37. As set forth below, the negligent and wrongful acts and omissions of employees of the United States complained of were conducted within the scope of their office or employment under circumstances where the United States, if a private person, would be liable under the law of the places where the respective acts and omissions occurred, and were substantial factors in bringing about Mr. Pizarro's death.

38. The acts complained of occurred in the Southern District of New York, and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).

39. Ms. Pizarro, as administrator of Daruis Pizarro's estate, is the proper party to assert this claim under the FTCA. Ms. Pizarro properly presented all claims asserted herein to the USMS and the BOP in writing on or about November 21, 2023, which was within two years of the claim's accrual.

40. The USMS and the BOP did not respond to Ms. Pizarro's claims within six months of her presenting them. Ms. Pizarro's FTCA claims in this Court are timely under 28 U.S.C.A. § 2675(a).

### JURY DEMAND

41. Plaintiff demands trial by jury in this action of all claims against the Wellpath Trust, NYCCSMS, Westchester County, and the Medical Defendants (together the "Westchester Defendants").

### STATEMENT OF FACTS

**Daruis Pizarro arrives at WCJ and is placed on suicide watch.**

42. On August 13, 2022, Daruis Pizarro was arrested for Hobbs Act Robbery.

10

He was 22 years old.

43. Mr. Pizarro was placed in the custody of the USMS as a federal pre-trial detainee on August 13, 2022.

44. The USMS assigned Mr. Pizarro to WCJ and transferred him to the WCJ on August 14, 2022.

45. Mr. Pizarro was admitted to WCJ as a federal pre-trial detainee on August 14, 2022.

46. Mr. Pizarro's August 14, 2022 intake assessment completed by WCJ staff states that upon arriving at WCJ, Mr. Pizarro appeared anxious, afraid, and/or angry, that this was his first arrest, that he had a history of psychiatric hospitalization as recently as the month prior, that he had attempted suicide at least once before, and that he was "requesting to speak to mental health." As a result of the intake assessment, Mr. Pizarro was placed on suicide watch.

47. Dr. Raul Ulloa, a physician employed by Wellpath LLC and WCJ's medical director, approved Mr. Pizarro's placement on suicide watch.

48. On August 14, 2022, Matthew A. Aronoff, MHP, categorized Mr. Pizarro as "Mental Health 1: Crisis-level mental disorder (acute condition, temporary classification)." Aronoff conducted a "Suicide Watch Initial Assessment" for Mr. Pizarro and noted that Mr. Pizarro had six suicide risk factors: (1) age; (2) gender; (3) being new to the facility; (4) first incarceration or arrest; (5) legal concerns; and (6) restrictive housing placement. No protective factors were noted. Aronoff's notes show that Mr. Pizarro refused to discuss a collaborative safety plan. Aronoff also noted that a review of Mr. Pizarro's intake assessment indicated a past suicide attempt and recent psychiatric hospitalization. Despite separately noting Mr. Pizarro's past suicide attempt and hospitalization, Aronoff failed to tick the "prior suicide attempts" and

"psychiatric hospitalization" boxes in the suicide risk factor field of Mr. Pizarro's initial suicide watch assessment. Aronoff classified Mr. Pizarro as an "intermediate risk" for self-harm, referred him to psychiatry, and ordered four interventions: (1) daily meetings with a mental healthcare professional; (2) developing a collaborative safety plan while on suicide watch; (3) a consultation with psychiatry regarding medication; and (4) CBT/DBT skills.

49.     Mr. Pizarro's August 15, 2022 Suicide Watch Daily Follow-Up noted eight risk factors: (1) age; (2) gender; (3) being new to the facility; (4) first incarceration or arrest; (5) legal concerns; (6) restrictive housing placement; (7) prior suicide attempts/suicide note found; and (8) psychiatric hospitalization. Mr. Pizarro continued to refuse a collaborative safety plan. Mr. Pizarro's suicide risk level was rated low but his suicide watch was continued. He was given three treatment objectives—that he would not engage in self-harming behavior; that he would tell staff if he had suicidal ideation; and that he would take medication prescribed by psychiatry—and three interventions: daily meetings with a mental healthcare professional; CBT/DBT skills; and a risk assessment.

50.     On August 16, 2022, Defendant Norton discharged Mr. Pizarro from suicide watch. Defendant Norton's August 16 notes identified only three risk factors: first incarceration or arrest, gender, and contradictory self-reports regarding Mr. Pizarro's history of psychiatric treatment and suicide attempts. Defendant Norton completed a collaborative safety plan with Mr. Pizarro, rated Mr. Pizarro's suicide risk as low, and discharged him from suicide watch. Defendant Norton ordered two interventions: a consultation with psychiatry regarding medications and CBT/DBT skills.

51.     On August 17, 2022, Linda Unneland, MHP, recorded a mental health progress note for Mr. Pizarro. She noted that Mr. Pizarro had been placed on suicide watch due

to "risk factors including being new to the facility, history of psychiatric hospitalization [in] the preceding month", depressive symptoms, and "having a history of at least one suicide attempt." Unneland noted that Mr. Pizarro described "feeling depressed but denied [suicidal ideation]." Per Unneland's notes, Mr. Pizarro denied being on psychiatric medication in the past and "rejected this as an option currently."

52.    On August 26, 2022, Michael Kunz, MHP, conducted Mr. Pizarro's psychiatric referral and completed a "Psychiatric Initial Observation" of Mr. Pizarro. Kunz noted that Mr. Pizarro had a history of major depressive/dysthymic symptoms as well as psychotic symptoms, including hearing voices two years prior. Kunz incorrectly noted that Mr. Pizarro had never been psychiatrically hospitalized and that he had no prior suicide attempts. He diagnosed Mr. Pizarro with an unspecified mood disorder and determined that treatment was not indicated. Per Kunz's notes, Mr. Pizarro denied ever taking psychiatric medications.

53.    Kunz did not document any discussion with Mr. Pizarro about commencing medication as a treatment option and/or prescribe Mr. Pizarro medication.

54.    Within a week of Kunz's consultation and conclusion that Mr. Pizarro required no treatment or medication, Mr. Pizarro was exhibiting signs of psychosis.

**Mr. Pizarro begins to psychiatrically decompensate while at WCJ.**

55.    Mr. Pizarro was transported to the Southern District of New York for his arraignment on September 1, 2022.

56.    As recognized by WCJ's suicide prevention policies, court appearances and setbacks in legal proceedings heighten the risk of psychiatric decompensation and suicide. Accordingly, WCJ's policies require that when "an inmate returns from a court appearance a Re-Book Risk Assessment Screening Form" be "immediately completed by the Intake Officer."

13

57.    On information and belief, WCJ did not complete a Re-Book Risk Assessment for Mr. Pizarro on September 1, 2022—Mr. Pizarro's Re-Book Risk Assessment was left entirely blank.

58.    Mr. Pizarro began to rapidly decompensate on September 1, 2022.  That evening, Unneland assessed Mr. Pizarro after a disciplinary incident.  Mr. Pizarro was "repeatedly heard to be rambling" and was exhibiting delusional behavior, stating "I shouldn't be here at all" in reference to his incarceration and "I need to be elevated.  I'm king."  Unneland noted that Mr. Pizarro "denied the presence of psychotic symptoms, but he may be under-reporting symptoms."  She classified Mr. Pizarro as "MH2: Mental health disorder severe enough to require ongoing intensive mental health treatment; almost always on psychotropic medication" and transferred Mr. Pizarro to the "2G Special Housing unit."

59.    Unneland did not document any discussion with Mr. Pizarro about commencing medication as a treatment option and/or prescribe Mr. Pizarro medication.

60.    On September 2, 2022, Defendant Norton filed a Mental Health Progress Note indicating that Mr. Pizarro had been involved in a fight and "presented as manic." Defendant Norton noted that during the assessment Mr. Pizarro "who is small in stature, was physically threatening the largest of the ESU team."  Defendant Norton concluded that Mr. Pizarro appeared to "pose a danger to others based on this pattern of behavior which appears attributable to paranoid and delusional thinking."

61.    Defendant Norton's notes indicate that Mr. Pizarro was initially transferred to the AMHU and then to 1K with "ESP status."

62.    Inmates housed in 1K "generally have an established psychiatric history or problem."

14

63. Defendant Norton noted that Mr. Pizarro would be "re-evaluated by Psychiatry in light of emerging psychosis/possible mania."

64. On information and belief, Mr. Pizarro was admitted to the 1K "Med Unit" on September 2, 2022, with a diagnosis of major depressive disorder.

65. On information and belief, throughout September and early October 2022, Mr. Pizarro was housed in either the 1K unit or the AMHU.

66. On information and belief, despite being housed in 1K and/or AMHU for over a month and despite Mr. Pizarro's suicide watch treatment plans ordering daily meetings with a mental healthcare professional, Defendant Norton's September 2 referral to psychiatry, and Mr. Pizarro's active and rapid decompensation, Mr. Pizarro did not meet with a mental healthcare clinician for more than a month. He was supervised almost exclusively by nurses during this period.

67. During this time, Mr. Pizarro repeatedly flooded his cell with water, refused to cooperate with staff, and requested Ensure to counter his weight loss. For example, in an October 6, 2022 request form reviewed by Defendant Bishop and Dr. Ulloa, Mr. Pizarro asked for Ensure, scribbling "Hunger strike Starvation Food" in the margin.

68. WCJ's suicide prevention policy recognizes all these behaviors—severe mood swings, lack of interest in people, rapid weight loss, and tension—as suicide warning signs.

69. On October 4, 2022, WCJ Officer Thomas, Shield #1870, and WCJ Sergeant Barrett, Shield #251, observed Mr. Pizarro with a plastic bag in his cell. Mr. Pizarro proceeded to cover the windows of his cell with towels. Officer Thomas and Sergeant Barrett referred Mr. Pizarro to mental health services.

70.     On October 12, 2022—40 days after Mr. Pizarro began exhibiting signs of psychosis and Defendant Norton made a psychiatry referral—Jennifer Maple, LCSW, conducted a Mental Health Initial Assessment and Treatment Plan for Mr. Pizarro.

71.     Between Mr. Pizarro's descent into psychosis on September 1 and his October 12 assessment with Maple, he does not appear to have had any meaningful involvement with a mental health professional.

72.     During the assessment, Mr. Pizarro reported a history of schizophrenia characterized by agitation and auditory hallucinations of "disturbing" content and told Maple that he was actively experiencing auditory hallucinations.  Mr. Pizarro also reported a four-day psychiatric hospitalization in 2019 and that he had been non-compliant with his treatment plan following discharge.  Maple noted that Mr. Pizarro appeared "oddly related, somewhat evasive, internally preoccupied" and was "smiling inappropriately during [the] evaluation."  Mr. Pizarro presented with "sexually preoccupied thought content and mild paranoia."  From her chart review, Maple determined that Mr. Pizarro was "a poor historian likely secondary to psychosis." She also noted that review of Mr. Pizarro's screening documents indicated a history of suicide attempts.  Maple encouraged Mr. Pizarro to "consider psychotropic medication trial."

73.     Maple ordered Mr. Pizarro's AMHU placement be maintained for a "higher level of MH treatment and monitoring."

74.     Maple concluded that Mr. Pizarro required intensive mental health monitoring due to "Decompensation/Acute Altered Mental Status" and that Mr. Pizarro should be maintained in the AMHU until he had a "decrease[d] risk level of all forms of behavior leading to self-harm" and "adhere[d] to psychotropic medication as directed by health care practitioner."

16

75.     Despite this order, on information and belief, Mr. Pizarro was never prescribed any psychotropic medication.

76.     Mr. Pizarro continued to deteriorate.  On October 13, 14, and 17, 2022, Defendant Bishop observed Mr. Pizarro "standing at [the] door, talking to himself."

77.     On October 18, 2022, Defendant Norton recommended the dismissal of disciplinary charges against Mr. Pizarro because his "mental health status significantly contributed" to his behavior.

**Westchester County Jail requests a transfer for Mr. Pizarro from USMS.**

78.     On October 18, 2022, Defendant Norton inquired over email with WCJ officials, including Booking and Transportation Captain Ivan Lopez, whether Mr. Pizarro could be transferred to federal custody.

79.     In his email to WCJ officials, Defendant Norton wrote: "I am unable to recommend a 730 exam for this patient (who is refusing voluntary psychiatric treatment).  Is there a means of returning him to the Feds so they can provide the higher level of care that he needs?"

80.     Shortly thereafter, WCJ Captain Lopez forwarded Defendant Norton's email to three USMS officials including Deputy Marshal David Astacio.  In that email, WCJ Captain Lopez stated: "Good morning all, Please see below and arrange to transfer the inmate back to USMS custody.  He is currently housed in our forensic unit, which is our most acute mental health unit.  Per our director of Mental Health, he should be housed in a facility where he can receive a higher level of care."

81.     Defendant Norton immediately wrote to USMS officials and informed them: "Mr. Pizarro is psychotic and behaviorally dysregulated in the context of refusing

17

voluntary psychiatric treatment."

82.    Within ten minutes, Deputy Marshal Astacio forwarded his email chain with Defendant Norton and Westchester County officials to four Marshals and "NYSCrimSec, USMS." In forwarding the email thread, Astacio wrote: "Transfer him to MDC Brooklyn ASAP."

**USMS arranges Mr. Pizarro's transfer but fails to follow procedure or notify BOP of Mr. Pizarro's deteriorating psychiatric condition.**

83.    Following Deputy Marshal Astacio's order to transfer Mr. Pizarro to MDC Brooklyn as soon as possible, a Marshal started a new email thread with BOP, copying Deputy Marshal Astacio and two other Marshals—all of whom were on the previous emails with Defendant Norton and Westchester County Jail officials, and were aware of the reason for the transfer and psychiatric condition of Mr. Pizarro.

84.    The Marshal wrote: "Please see attached 129 and 130 forms, USMS is requesting bed space for transfer to BOP facility tomorrow 10-19-2022."

85.    This email made *no mention* of the information the USMS had just learned regarding Mr. Pizarro's psychiatric condition and the purpose of the transfer being for Mr. Pizarro to receive a "higher level of care."

86.    None of the other USMS officials aware of Mr. Pizarro's condition or the reason for the transfer added that information to the email thread.

87.    Not only did USMS fail to advise the BOP of Mr. Pizarro's illness, USMS provided Forms USM-129 (Individual Custody and Detention) and USM-130 (Prisoner Custody Alert Notice) for Mr. Pizarro that erroneously stated that Mr. Pizarro had no medical or mental health conditions.

88.    Once the USMS received confirmation from BOP that it had bed space for

Mr. Pizarro, it next requested the transfer team have "WAB/MED Summary, Covid swab test result and if prescribed 7-days of medication."

89.    Again, none of the Marshals on the email thread with knowledge of Mr. Pizarro's mental health condition or the reason for the transfer spoke up.

90.    Following Mr. Pizarro's death, USMS Chief Deputy Peter McCauley acknowledged that "neither of the[] emails" from the Westchester Defendants explaining the reason for and psychological condition of Mr. Pizarro "were forwarded to the BOP."

91.    The USMS is responsible for the medical and mental health care of federal detainees in its custody.

92.    The USMS's Prisoner Operations Division ("POD") establishes and maintains the USMS prisoner health care program.

93.    When a USMS district learns of a serious mental health condition requiring medical treatment, it must notify POD.

94.    Per USMS policy, the USMS should have notified the POD of Mr. Pizarro's' mental health crisis.

95.    The USMS was likewise required to ensure that all pertinent medical information about Mr. Pizarro was transmitted to the BOP upon Mr. Pizarro's transfer and uploaded in federal interdepartmental databases.

96.    On information and belief, USMS did not alert the POD regarding Mr. Pizarro's serious mental health condition requiring treatment.

97.    On information and belief, USMS policy requires its staff to take special precautions when transporting mentally impaired prisoners, including to collect a written statement about the prisoner's condition from the transferring facility and inform the receiving

19

facility of the prisoner's impairment.

98.    On information and belief, USMS did not obtain the necessary written statement from staff at WCJ Jail nor did it inform the receiving facility (the MDC) that Mr. Pizarro was in the midst of a severe mental health crisis.

99.    On information and belief, USMS did not inform BOP of Mr. Pizarro's psychiatric status although such information was known to it.

100.    On information and belief, USMS did not take any steps to update any central federal databases, such as SENTRY, to indicate Mr. Pizarro's mental health care level assignment or status.

101.    On information and belief, the USMS failed to communicate Mr. Pizarro's mental health status via any channel—either formally or informally—to the BOP or any other federal agency involved in Mr. Pizarro's transfer and custody.

102.    As the agency charged with Mr. Pizarro's custody and having received notice of Mr. Pizarro's mental state, USMS had a duty to inform the BOP of Mr. Pizarro's psychiatric status and the reason for his transfer to the MDC.

**The Westchester Defendants fail to convey Mr. Pizarro's severe mental health crisis upon his transfer and provide misinformation to the receiving facility.**

*The Westchester Defendants fail to complete the Special Precautions Form.*

103.    Mr. Pizarro's transfer from WCJ to the MDC was initiated by the USMS on the morning of October 19, 2022.

104.    Upon transfer of an inmate, WCJ's Suicide Prevention and Crisis Prevention policy requires interagency notification of mental health status and suicide risk via custodial transfer forms and "Special Precautions" forms.

105.    Custodial transfer forms "are completed and forwarded to ensure that the

20

receiving facility is *immediately* informed of any risk of suicide and/or present or historical psych history."

106. The Special Precautions Form is "completed and provided to agencies tasked with transporting inmates . . . to inform them of an inmate's mental health status." The receiving agency is required to sign the Special Precautions Form to acknowledge "receiving the inmate, special precautions, and medical paperwork."

107. On information and belief, the Westchester Defendants failed to complete a Special Precautions form for Mr. Pizarro even though Mr. Pizarro had spent almost the entirety of his two months at WJC on suicide watch or in the 1K and AMHU units.

*The Westchester Defendants fail to properly complete Mr. Pizarro's "outslip."*

108. Pursuant to WCJ's policy governing the discharge and transfer of inmates, "[a]ny release of any inmate to another agency" requires an "outslip", on which the completing "officer is required to make sure any special precautions are noted." The "receiving agency will be required to sign the form to acknowledge receiving the inmate, special precautions and the medical paperwork."

109. WCJ generated an "outslip report" for Mr. Pizarro on October 19, 2022, at 12:12 AM.

110. The outslip indicated that Mr. Pizarro was to be escorted by the Westchester County Department of Corrections and was signed by "setup officer" Doyle, Shield #1479, and "discharge officer" Shield #1496. Officer Jimenez, Shield #1814, signed as the "accepting officer."

111. The outslip shows an alert for "intake classification[:] new admission protocol."

21

112.    The outslip contained check boxes for "behavioral health letter" and "prescribed medication envelope."

113.    The Westchester Defendants failed to provide a behavioral health letter or check this box despite the fact that Mr. Pizarro was in psychiatric decompensation and was being transported for psychiatric care.

*The Westchester Defendants omit Mr. Pizarro's Mental Health Score from all documentation.*

114.    WCJ and Wellpath LLC policy also requires that an inmate's mental health score be "included on *all transfer letters* as these scores are used by all prisons in the state of New York" (emphasis in original).

115.    The Westchester Defendants failed to include Mr. Pizarro's MH2 score— *i.e.*, "mental health disorder severe enough to require specialized housing AND ongoing intensive mental health treatment; almost always on psychotropic medication"—on *any* of the paperwork sent to the MDC.

*The Medical Defendants misrepresent Mr. Pizarro's mental health on the Prisoner in Transit Medical Form.*

116.    The Medical Defendants failed to accurately complete the Prisoner in Transit Medical form.  The form was riddled with errors, and of all Mr. Pizarro's WCJ medical records, the form included only two outdated, inaccurate, and incomplete medical records that obscured his psychiatric condition and risk of suicide.

117.    Defendant Bishop completed and signed the Prisoner in Transit Medical Summary that accompanied Mr. Pizarro.

118.    Between August 14 and October 17, 2022, Defendant Bishop was responsible for Mr. Pizarro's care and completed medical records for Mr. Pizarro on at least 21 occasions.

22

119.    Defendant Bishop was aware of Mr. Pizarro's psychiatric diagnoses and, on at least four occasions, observed Mr. Pizarro speaking to himself.

120.    As WCJ's own policies recognize, when a federal prisoner is transferred from one facility to another, custodial transfer forms like the Prisoner in Transit Medical Summary provide the immediately available synopsis of the patient's contemporaneous medical status to the receiving institution's staff on transfer day.

121.    The Prisoner in Transit Medical Summary form completed by Defendant Bishop was the only medical form immediately available to the MDC's intake staff on October 19, 2022.

122.    The form's instructions specifically provided: "BOX 3: The goal of this section is to identify recent medical conditions or changes in medical conditions that might impact the transfer of a prisoner. Positive responses in this section should be further explained in BOX 7 (COMMENTS)."  One of the relevant conditions identified in Box 3 is "Suicide watch/psychiatric decompensation within past month."

123.    Defendant Bishop failed to check the box for "Suicide watch/psychiatric decompensation within past month."  Instead, she erroneously documented that Mr. Pizarro had *no* medical conditions even though she had personally been responsible for Mr. Pizarro's care on at least 21 occasions, had observed Mr. Pizarro speaking to himself numerous times, was aware that he had spent over a month in unit 1K and/or the AMHU, and was aware that he had an unspecified mood disorder diagnosis.

*The Medical Defendants fail to provide complete or accurate medical records for Mr. Pizarro.*

124.    To make matters worse, the only medical records attached to the Prisoner in Transit Summary were (1) an August 29, 2022 Health and Physical Assessment that

23

erroneously reported that Mr. Pizarro had never attempted suicide and had no history of psychiatric hospitalization and (2) an incomplete version of Kunz's August 26, 2022 Psychiatric Initial Evaluation, which likewise erroneously indicated no history of suicide or psychiatric hospitalization.

125.    These records made up only 13 of the 157 pages of records the Medical Defendants had for Mr. Pizarro.

126.    Despite transferring Mr. Pizarro for the very purpose of receiving a higher level of mental health care due to his decompensation and psychosis, the Medical Defendants did not provide a single medical record to the receiving facility addressing Mr. Pizarro's severe psychiatric decline.

127.    As Mental Health Director and as the physician who had initiated Mr. Pizarro's transfer in the first place, Defendant Norton was responsible for ensuring that WCJ did everything necessary to ensure Mr. Pizarro's safety during transfer and his continuity of care.

128.    As a result of the Medical Defendants' failures to properly complete the Special Precautions Form, Prisoner in Transit Medical Summary, or provide complete medical records for Mr. Pizarro, MDC's intake staff did not immediately receive information on Mr. Pizarro's mental health condition or the special psychiatric precautions—his initial placement in suicide watch and then the 1K and AMHU units—applicable to his care.

**Mr. Pizarro is transferred to the MDC.**

129.    Westchester County Department of Corrections Sergeant Larry Vazquez, Shield #54971, Officer Eric Jimenez, Shield #84244, and Officer Jason Jones, Shield #39443, transported Mr. Pizarro from WCJ to USMS custody in Manhattan on the morning of October 19, 2022.

24

130. USMS staff then transported Mr. Pizarro from Manhattan to the MDC.

**The BOP failed to conduct an adequate intake screening of Mr. Pizarro.**

131. Pursuant to BOP policy, "[i]mmediately upon an inmate's arrival" to a BOP facility, "staff shall interview the inmate" and "evaluate both the general physical appearance and emotional condition of the inmate." The interviewer "shall also review SENTRY information and the Inmate Central File."

132. On information and belief, Mr. Pizarro was emotionally distressed upon arriving at the MDC on October 19, 2022.

133. During his time at WCJ, Mr. Pizarro had become increasingly visibly unwell, to the point that he was speaking to himself and hearing voices.

134. On information and belief, Mr. Pizarro was emotionally disturbed and acting out during the transport from WCJ to the MDC on October 19, 2022, engaging in an altercation with the transporting officers.

135. On information and belief, Mr. Pizarro arrived at the MDC in an obvious psychiatric emergency. Had the BOP's immediate screening been properly conducted, the BOP receiving staff would have observed Mr. Pizarro's psychiatric condition and his risk of suicide.

136. In such circumstances, BOP policy authorizes "any staff member" to place an inmate on suicide watch. Instead, BOP staff placed Mr. Pizarro alone in a cell with a t-shirt.

137. BOP is responsible for ensuring that Mr. Pizarro was properly screened and supervised upon his arrival at the MDC.

138. The BOP's chronic failures in abiding by its own policies and of housing people in single-cells are significant drivers of inmate suicides—the leading cause of in custody deaths—and specifically of inmate deaths by hanging, like Mr. Pizarro's.

25

**Mr. Pizarro dies by suicide within hours of arriving at the MDC.**

139. On information and belief, once Mr. Pizarro arrived at the MDC, the BOP placed him unguarded and alone in a cell with an institution-issued t-shirt.

140. On information and belief, the BOP failed to adequately supervise Mr. Pizarro while he was in his cell.

141. On information and belief, MDC staff failed to conduct any rounds on Mr. Pizarro's housing unit between when he was placed in his cell and approximately 4:19 p.m.

142. On information and belief, for over three hours, Mr. Pizarro was left entirely unattended in his cell without any supervision.

143. On information and belief, Mr. Pizarro, who was 5'02" and no more than 120 lbs, was left unattended alone in a cell long enough to fashion a t-shirt into a noose and successfully hang himself.

144. The brain can last five to ten minutes without oxygen.

145. At approximately 4:19 p.m. on October 19, 2022, Mr. Pizarro was found hanging in his cell. He had used the institution-issued t-shirt to hang himself. He was 22 years old.

146. On information and belief, Mr. Pizarro was not cut down from a hanging position sufficiently quickly to survive.

147. On information and belief, even once Mr. Pizarro was seen hanging, the BOP failed to act with urgency because MDC staff's initial reaction was that Mr. Pizarro was "playing."

148. On information and belief, had MDC staff conducted adequate rounds, Mr. Pizarro's preparations to die by suicide would have been observed and his suicide could

have been prevented.

149.    Mr. Pizarro was officially pronounced dead at NYU Langone Hospital in Brooklyn at 5:15 p.m. on October 19, 2022.

150.    Mr. Pizarro's suicide was the foreseeable consequence of the Defendants' independent, numerous, and repeated failures at every step of Mr. Pizarro's confinement and his transfer process on October 19, 2022.

**The BOP's chronic failure to comply with its own policies causes deaths by suicide, especially at the MDC.**

151.    Deaths by suicide make up the majority of inmate deaths in BOP custody. Of suicides, the majority are deaths by hanging.

152.    According to a February 2024 Office of the Inspector General (OIG) report, "suicide represents a significant risk area for the BOP" caused in part by "a combination of recurring policy violations and operational failures."

153.    The OIG found that, as in Mr. Pizarro's case, BOP staff "failed to communicate with each other and coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress."

154.    More than half of inmates who died by suicide in custody were placed in single-cell confinement or housed alone in a cell, like Mr. Pizarro.  Both the OIG and the BOP itself have recommended against single-cell confinement.

155.    The OIG also found that failures in conducting adequate rounds is a major contributor to in-custody suicides. In over a third of inmate suicides investigated by the OIG, the BOP failed to conduct adequate rounds.

156.    These operational failures have led to suicides shockingly similar to Mr. Pizarro's.  For example, the OIG report highlights a suicide that occurred after a psychologist

27

"documented concerns about suicide risk for an inmate awaiting transfer but did not conduct a formal Suicide Risk Assessment or assign an alert in the BOP's inmate management system, SENTRY, which would have warned staff at the receiving institution that the inmate had an elevated risk of self-harm."  Like Mr. Pizarro, that individual died by suicide one day after transfer.

157.    The BOP placed Mr. Pizarro in single-cell confinement despite notice that such placement is dangerous and despite many risk factors in Mr. Pizarro's case that counseled for different placement.

158.    The BOP failed to conduct adequate rounds of Mr. Pizarro's housing unit despite notice that inadequate supervision is a significant factor in inmate suicides.

159.    Within the BOP system, at least four inmates have died by suicide in the past three years alone at the MDC.

160.    One of those four deaths was Mr. Pizarro.

161.    As the OIG's report makes clear, these four deaths could have been avoided had BOP followed its own established policies and procedures.

**Plaintiff's Notices of Claim on Westchester County**

162.    Within 90 days of Ms. Pizarro's appointment as administrator of Mr. Pizarro's estate, written notice of claim, sworn by Ms. Pizarro, was served upon the County by personal delivery of notice.

163.    On January 8, 2024, an order of the Supreme Court of the State of New York, Westchester County, extended the time *nunc pro tun* pursuant to N.Y. Mun. Law § 50-e(5) for Ms. Pizarro to file a notice of claim for conscious pain and suffering on behalf of Mr. Pizarro's estate.

164. At least thirty days have elapsed since service of the notices of claim, and adjustment or payment of the claim has been neglected or refused.

165. Plaintiff filed the original complaint on January 16, 2024, within one year and ninety days of Mr. Pizarro's death.

**FIRST CAUSE OF ACTION**
42 U.S.C. § 1983 – Fourteenth Amendment
Deliberate Indifference to Serious Medical Needs
(Against the Medical Defendants)

166. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

167. As a result of the Medical Defendants' failure to provide federal authorities with basic information about Mr. Pizarro's mental health status or with a Special Precautions form, their failure to accurately complete the Prisoner in Transit Medical Summary, and their inclusion of outdated, inaccurate, and incomplete medical records, the receiving staff at the MDC had no accurate or contemporaneous medical information for Mr. Pizarro.

168. The Medical Defendants, who were responsible for Mr. Pizarro's care including the transfer of his care, utterly disregarded his serious medical condition and ignored the urgent need for Mr. Pizarro to receive continuous, uninterrupted mental health treatment and supervision for his severe mental illness.

169. The Medical Defendants committed these acts and omissions even though they had themselves initiated Mr. Pizarro's transfer to the MDC for the very purpose of him receiving mental health care that WCJ could not provide and despite the Medical Defendants' extensive and personal knowledge of Mr. Pizarro's history of suicide attempts, psychiatric hospitalization, placement on suicide watch, and rapidly declining psychiatric condition while at WCJ. Defendants' conduct constituted deliberate indifference to Mr. Pizarro's serious medical

29

needs.

170.    The Medical Defendants acted at all times relevant hereto willfully, wantonly, maliciously, and/or with such reckless disregard of consequences as to reveal deliberate indifference to the clear risk of death or serious injury to Mr. Pizarro.  As a direct and proximate result of Medical Defendants' violations of Mr. Pizarro's constitutional rights, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

## SECOND CAUSE OF ACTION
Common Law Negligence
(Against the County, Wellpath Trust, NYCCSMS, and Medical Defendants)

171.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

172.    The Westchester Defendants owed a duty of care to Mr. Pizarro as a pre-trial detainee at WCJ.

173.    The Westchester Defendants breached the duty of care that they owed to Mr. Pizarro by failing to provide for his continuity of care, failing to provide medical and mental health treatment, and/or otherwise neglecting his medical and mental health needs.

174.    The Westchester Defendants' breach of their duty of care was a proximate cause of and substantial factor in Mr. Pizarro's serious and unnecessary injuries, including severe pain and suffering and death.

175.    Defendants Wellpath Trust and New York Correct Care Solutions Medical Services, P.C., as employers of all or some of the Medical Defendants, is responsible for their negligence under the doctrine of *respondeat superior*.

176.    Defendant County is also responsible for Defendants Wellpath Trust,New

York Correct Care Solutions Medical Services, P.C.'s, and the Medical Defendants' negligence because it retained them to perform services that the County had undertaken to perform and was under a special duty and legal obligation to perform.

177.    As a direct and proximate result of the neglect detailed above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

**THIRD CAUSE OF ACTION**
Medical Malpractice
(Against the County, Wellpath Trust, NYCCSMS and Medical Defendants)

178.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

179.    At all times relevant to this Complaint, the County undertook to provide medical and mental health care to inmates in its custody at WCJ, including Mr. Pizarro, and it was legally obligated and had a special duty to do so effectively.

180.    The Medical Defendants, NYCCSMS, and Wellpath LLC were employed, retained and/or contracted by the County to provide medical and mental health care to all inmates in the care and custody of the County at WCJ, including Mr. Pizarro.

181.    The Medical Defendants, Defendant NYCCSMS, and Wellpath LLC agreed and purported to provide medical care and services to inmates in WCJ, including Mr. Pizarro, from August 14, 2022, until October 19, 2022.

182.    The Medical Defendants NYCCSMS, and Wellpath LLC held themselves out as possessing the proper degree of learning and skill necessary to render medical care, treatment, and services in accordance with good and accepted medical practice, and as undertaking to use reasonable care and diligence in the care and treatment of WCJ inmates,

31

including Mr. Pizarro.

183. The Medical Defendants, Defendant NYCCSMS, and Wellpath LLC were negligent and careless, acted contrary to sound medical practice, and committed acts of medical malpractice against Mr. Pizarro.

184. Defendant NYCCSMS, and Wellpath LLC, as employer of some or all of the Medical Defendants, are responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

185. Defendant County, as employer of some or all of the Medical Defendants, is responsible for their negligence and wrongdoing under the doctrine of *respondeat superior*.

186. Defendant County is also responsible for Defendant NYCCSMS, the Medical Defendants' and Wellpath LLC's negligence and wrongdoing because it retained them to perform services that the County had undertaken to perform and was under a special duty and legal obligation to perform.

187. As a result of Defendants' medical malpractice, negligence, carelessness, and unskillfulness, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

### FOURTH CAUSE OF ACTION
Wrongful Death
(Against the County, Wellpath Trust, NYCCSMS, and Medical Defendants)

188. Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

189. By reason of the foregoing, the statutory distributees of Mr. Pizarro's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Pizarro. The Westchester Defendants are liable

for the wrongful death of Mr. Pizarro.

190.    As a direct result of the Westchester Defendants' negligence alleged above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

## FIFTH CAUSE OF ACTION
Conscious Pain and Suffering
(Against the County, Wellpath Trust, NYCCSMS and Medical Defendants)

191.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

192.    As a direct result of the Westchester Defendants' negligence alleged above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

## SIXTH CAUSE OF ACTION
28 U.S.C. §§ 1346(b) and 2674
Federal Torts Claim Act
Negligence
(Against Defendant United States)

193.    Plaintiff realleges and incorporates by reference each allegation contained in the preceding paragraphs as if the same were fully set forth herein.

194.    At all relevant times pursuant to this Complaint, Defendant United States, acting through the USMS and the BOP, owed a duty of care to Mr. Pizarro, which included providing him with mental health care, adequate screening and supervision to assess for his risk of suicide, and not subjecting him to unreasonable risk of foreseeable suicide.  The standard of care required, among other things, continuity of Mr. Pizarro's care and prompt attention to his mental health needs.  In light of Mr. Pizarro's many risk factors for suicide including his age, that it was his first incarceration, his history of suicide attempts, his recent decompensation, and

33

his transfer to a new facility, that duty required the United States to act with particular caution.

195. At all relevant times pursuant to this Complaint, Defendant United States breached its duty by failing to adequately communicate Mr. Pizarro's psychiatric needs and status interdepartmentally between the USMS and BOP, failing to follow USMS policy to ensure the safe transfer of mentally unwell inmates, and failing to conduct an adequate mental health evaluation upon Mr. Pizarro's arrival at the MDC.

196. The USMS failed to follow its own policies regarding the transfer of mentally unwell inmates, failed to ensure that the documentation accompanying Mr. Pizarro reflected what USMS knew about Mr. Pizarro's mental health status, failed to follow protocols to ensure that interdepartmental systems reflected Mr. Pizarro's mental health status, and failed to communicate its knowledge of Mr. Pizarro's serious mental health status to the BOP.

197. The BOP failed to adequately screen Mr. Pizarro for mental health issues upon his arrival at MDC and failed to adequately supervise Mr. Pizarro after leaving him alone in a cell at MDC.

198. A private employer would otherwise be liable for the negligence of its employees who committed the acts and omissions alleged herein. Defendant United States is therefore liable for tort claims under the FTCA.

199. As a direct and proximate result of the conduct alleged above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

**SEVENTH CAUSE OF ACTION**
Federal Torts Claim Act
Wrongful Death/Conscious Pain and Suffering
(Against Defendant United States)

200. Plaintiff realleges and incorporates by reference each allegation contained

in the preceding paragraphs as if they were set forth herein.

201.    As a direct and proximate result of the negligence alleged above, the statutory distributees of Mr. Pizarro's estate sustained pecuniary and non-economic loss resulting from the loss of love, comfort, society, attention, services, and support of Mr. Pizarro.

202.    As a direct and proximate result of the negligence alleged above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

203.    As a direct result of the conduct alleged above, Mr. Pizarro suffered physical injury, severe pain and suffering, emotional distress, monetary damages, and death.

204.    Defendant United States is liable for the wrongful death of Mr. Pizarro.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment against Defendants and Wellpath Trust as follows:

1.    An award of compensatory damages in an amount to be determined at trial for Mr. Pizarro' illness and injuries;

2.    An award of compensatory damages in an amount to be determined at trial to account for Mr. Pizarro's pain and suffering;

3.    An award of compensatory damages to account for Mr. Pizarro's death;

4.    An award of compensatory damages to account for Mr. Pizarro's lifetime lost earnings;

5.    An award to Plaintiff of reasonable attorneys' fees and costs, interest, and disbursements under, *inter alia*, 42 U.S.C. § 1988 and 28 U.S.C. § 2412; and

35

6.      Such other and further relief as the Court may deem just and proper.

Dated: August 11, 2025
       New York, New York                    EMERY CELLI BRINCKERHOFF
                                             ABADY WARD & MAAZEL LLP


                                             _____/s_____
                                             Katherine Rosenfeld
                                             Sana F. Mayat
                                             One Rockefeller Center, 8th Floor
                                             New York, New York 10020
                                             (212) 763-5000

                                             *Attorneys for Plaintiff*

36